UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E.W.K. and B.K., and on Behalf of Their Minor
Child, B.K.,

                                        Plaintiffs,                    10-CV-7324 (KMK)

        -v-                                                            <u>OPINION AND ORDER</u>

THE BOARD OF EDUCATION OF THE
CHAPPAQUA CENTRAL SCHOOL DISTRICT,
and THE CHAPPAQUA CENTRAL SCHOOL
DISTRICT,

                                        Defendants.

---

<u>Appearances:</u>

Julie Ero Gaughran, Esq.
Asher & Associates
New York, NY
*Counsel for Plaintiffs*

Mark Craig Rushfield, Esq.
Lisa S. Rusk, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        E.W.K. and B.K. (collectively "Plaintiffs") bring this action pursuant to the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and New York Education

Law § 4404.3, seeking to overturn the determination of the State Review Officer ("SRO") that

the Board of Education of the Chappaqua Central School District and the Chappaqua Central

School District (collectively "Defendants" or "District") are not required to reimburse Plaintiffs

for their unilateral placement of their child, B.K., at the Windward School ("Windward") for the

2007/2008, 2008/2009, and 2009/2010 school years.  The Parties cross-move for summary

judgment.  For the reasons given below, Plaintiffs' Motion for Summary Judgment is denied, and Defendants' Motion is granted.

I.  Background

A.  Factual Background

B.K. is a 14-year-old child with learning disabilities who resides with his parents E.W.K. and B.K. in the Chappaqua Central School District.[1]  B.K. began receiving remedial help in kindergarten for his "difficulty with letters and their sounds" (Compl. ¶ 16), and began receiving private tutoring in first grade, (id. ¶ 19).  In the spring of 2003, B.K. underwent extensive language testing in school.  (Dist. Ex. 30, at 8.)

In August 2003, Plaintiffs felt that B.K. was struggling, and brought him to Dr. Marta Flaum, a licensed psychologist, for an evaluation.  (Dist. Ex. 30.)  Dr. Flaum found that B.K. had "overall average intellectual ability," with weaknesses in language skills, slow processing speed, and weak motor skills.  (Id. at 5, 10-11.)  Dr. Flaum found that B.K.'s writing and reading comprehension showed "significant delays," and that B.K. met the "criteria for a severe reading disability."  (Id. at 13-14.)  Dr. Flaum recommended that B.K. be characterized "as a language disabled student," and that "school based reading intervention . . . be supplemented by private tutoring."  (Id. at 16.)

In second grade, the 2003/2004 school year, B.K. was classified as a student with a learning disability by the District's Committee on Special Education ("CSE").  (Compl. ¶ 26.)[2] An Individualized Education Program ("IEP") for the 2003/2004 school year was generated on

---

[1] The Court will hereafter use "B.K." to refer exclusively to the 14-year-old child at issue, and not his father.

[2] B.K.'s eligibility for special education services as a student with a disability is not in dispute.

October 20, 2003, which provided for: four 45-minute sessions per week with a consultant teacher at a 6:1 ratio; one 30-minute one-on-one occupational therapy session per week; and two 30-minute speech/language therapy sessions per week at a 5:1 ratio.  (Pls.' Ex. J, at 1.)   The IEP also provided for certain modifications and accommodations.  (*Id.* at 1-2.)  The IEP took into account Dr. Flaum's 2003 evaluation.  (*Id.* at 4.)  The IEP contained two reading goals (*id.* at 4-5), but did not provide for any express services or instruction pertaining to reading.  This IEP also listed goals for speech/language and writing.  (*Id.* at 5-6.)

For third grade, the 2004/2005 school year, the CSE met on March 15, 2004, and generated an IEP that provided for: five 40-minute sessions with a consultant teacher per week; one 30-minute occupational therapy consultation per month; and two 30-minute speech/language sessions per week, all at a 5:1 ratio.  (Parent Ex. X, at 1.)  Other modifications and accommodations were again included.  (*Id.* at 2.)  The IEP included two reading goals, one speech/language goal, and one writing goal.  (*Id.* at 5-6.)

For fourth grade, the 2005/2006 school year, the CSE met on April 27, 2004, and generated an IEP that provided for: five 45-minute sessions with a consultant teacher per week; one 30-minute occupational therapy consultation per month; and two 30-minute speech/language sessions per week, all at a 5:1 ratio.  (Parent Ex. K, at 1.)  Consultant teaching services were to "address written expression and comprehension."  (*Id.*)  Other modifications and accommodations were again included.  (*Id.* at 1-2.)  The IEP included two reading, one writing, and one speech/language goal.  (*Id.* at 6-7.)

On May 31, 2006, the CSE met to create a 2006/2007 IEP, which was similar to the 2005/2006 IEP, and which again did not provide for specific reading services.  (Pls.' Ex. CC, at 1.)  However, as with earlier IEPs, this IEP provided for consultant teacher services, which were intended to address written expression and reading comprehension.  (*Id.*)  Direct consultant

teacher services were to be provided in four 40-minute sessions per week, and indirect consultant teacher services were to be provided in a separate, 40-minute session once per week.  (*Id.*) Moreover, this IEP provided for two separate 40-minute speech/language therapy sessions per week.  (*Id.*)  Also, this IEP included two reading, three writing, and four speech/language goals. (*Id.* at 7-8.)

On September 26, 2006, Plaintiffs submitted an application to Windward, a private school that works with children with language learning disabilities of "average to above average intelligence."  (Pls.' Ex. II; Tr. 1001-02.)[3]  On the application, Plaintiffs stated that B.K. "struggle[d] with reading and expressive language," and that he "would like to have more free time for sports and playdate[s] instead of having to work with tutors."  (Pls.' Ex. II.)  On September 11, 2006, Dr. Flaum completed a re-evaluation of B.K.  (Dist. Ex. 29.)  Dr. Flaum concluded that B.K. was at a third grade reading level, and recommended "one to three years at a special education school such as Windward" or three other listed schools.  (*Id.* at 11, 15.)  In October 2006, Defendants conducted a psychological evaluation, a speech and language evaluation, and an educational evaluation of B.K.  (Dist. Exs. 10, 16, 17.)

Plaintiffs provided Dr. Flaum's re-evaluation report to Defendants, and the CSE conducted a re-evaluation review on November 9, 2006, taking into account Dr. Flaum's evaluation and the three new District evaluations from October 2006.  (Dist. Ex. 4, at 6.)  The CSE changed B.K.'s disability from Learning Disability to Speech/Language Disability.  (*Id.*) The CSE then reconvened on December 13, 2006, and generated a new 2006/2007 IEP that provided for: four 40-minute direct sessions with a consultant teacher per week (which, again,

---

[3] Cites to "Tr." refer to the transcripts of the eight days of hearings before the Impartial Hearing Officer ("IHO"), conducted between October 15, 2009 and January 29, 2010.

were to address written expression and reading comprehension); one 40-minute indirect session with a consultant teacher per week; and two 40-minute speech/language sessions per week, all at a 5:1 ratio.  (Dist. Ex. 4, at 1.)  Other modifications and accommodations were again included, such as additional time to complete tasks and take tests, access to word processing, and repetition of directions and questions.  (*Id.* at 2-3.)  This IEP also contained reading, writing, math, and speech/language goals.  (*Id.* at 7-9.)[4]

On March 10, 2007, Plaintiffs signed a contract with Windward.  (Pls.' Ex. JJ.)  The contract provided that after July 31, 2007, cancellation would result in the loss of the full $38,400 tuition fee.  (*Id.*)  Plaintiffs claim that at this point they "still preferred that [B.K.] stay in his home school," and "had not yet decided to send him to [Windward], but were very concerned about his lack of reading progress and lack of reading help, and did not want him to be shut out of the help he needed."  (Compl. ¶ 48; *see also* Tr. 1361 (E.W.K.'s testimony that at that point, Plaintiffs had not yet decided to take B.K. out of the District, and "were still optimistic" they could work something out with the District).)

The CSE met on April 26, 2007, and generated a 2007/2008 IEP which was similar to the 2006/2007 IEP.  (Dist. Ex. 5.)  The IEP did not include additional reading instruction, which E.W.K. again requested.  (Tr. 1368-69.)  It did, however, include "Skills Seminar" (twice per four-day cycle), and speech/language therapy (twice per week).  (Dist. Ex. 5, at 1.)  This IEP also contained three writing and five speech/language goals.  (*Id.* at 6-7.)  Both parents were present at the CSE meeting, but did not indicate to the April 2007 CSE that they were

_____

[4] Plaintiffs allege that during the December 13, 2006 CSE meeting, E.W.K. "again asked for help with reading and was, once again, told that B.K. was making improvements and was being provided with the help he needed."  (Compl. ¶ 33.)

considering placing B.K. at Windward for the upcoming school year.  (Tr. 1443-44.)  The IEP does not note any objections from Plaintiffs, but E.W.K. testified that she did not agree to an IEP without reading goals, and was told that the IEP would reflect this objection.  (*Id.* at 1366-67.)

On August 13, 2007, Plaintiffs submitted a "10 day letter" to Defendants, informing them of their intent to send B.K. to Windward for the 2007/2008 school year.  (Pls.' Ex. OO.)  Plaintiffs assert that the purpose of the letter "was to enable [Defendants] to provide their son with an appropriate program, and were optimistic that [Defendants] would do so," because Plaintiffs "still wanted B.K. to stay in the public school."  (Compl. ¶ 51; *see also* Tr. 1439-40 (E.W.K.'s testimony that the letter was sent "to see if the school would remedy and clarify and make changes [so] that [B.K.] would have an appropriate education plan").)  Nothing in this letter, however, states this intention.

The CSE reconvened on September 5, 2007, and generated a new 2007/2008 IEP that provided for two 40-minute speech/language sessions per week and four 40-minute sessions of "Skills Seminar" per four-day cycle, all at a 5:1 ratio.  (Dist. Ex. 6, at 1.)  Other modifications and accommodations were again included, as well as three writing and five speech/language goals.  (*Id.* at 2-3, 6-7.)  The IEP noted that as of April 2007, Plaintiff had made "significant improvement" in "all academic areas," and "good progress . . . across all speech-language goals."  (*Id.* at 3.)

According to the 2007/2008 IEP, Plaintiffs informed the CSE at the September 5, 2007 meeting that they had decided to pull B.K. out of the District and send him to Windward.  (*Id.* at 6.)  Plaintiffs allege that "[h]ad the CSE offered an appropriate program for [B.K.], to wit, the one hour of reading instruction five times per week recommended by Dr. Flaum, B.K. would

have stayed in the District." (Compl. ¶ 54.)  B.K. attended Windward for the 2007/2008 school

year. (Tr. 1385.)

The CSE convened on May 12, 2008, and generated a 2008/2009 IEP that was similar to

the 2007/2008 IEP. (Dist. Ex. 7.)  Defendants later received a letter from Plaintiffs indicating

that they were planning to place B.K. at Windward again for the 2008/2009 school year. (Tr.

282.)  Defendants then reconvened the CSE on August 18, 2008, to hear from Plaintiffs and

address their concerns. (*Id.*)  The CSE generated a new 2008/2009 IEP that provided for: two

40-minute reading instruction sessions per week; two 40-minute speech/language sessions per

week; and four 40-minute sessions of "Skills Seminar" per four-day cycle, all at a 5:1 ratio.

(Dist. Ex. 8, at 1.)  The IEP also included four annual reading goals, in addition to three writing

and five speech/language goals. (*Id.* at 8-9.)  Defendants have indicated that the additional

reading goals and services were due to a decline in B.K.'s test scores, as well as discussions with

Plaintiffs and B.K.'s Windward teacher. (Tr. 311-15.)  Plaintiffs objected to this IEP, arguing

that the reading sessions should be increased to five days per week. (Dist. Ex. 8, at 7.)  The

District concluded that two days was sufficient for B.K. to achieve his annual goals, and noted

the teachers' concern that "pulling [B.K.] from academic classes too frequently would be a

detriment to his learning." (*Id.*)  B.K. attended Windward during the 2008/2009 school year.

(Pls.' Ex. QQ.)

The CSE convened on May 12, 2009, and generated a 2009/2010 IEP that provided for:

three 40-minute direct teacher consultations in English/Language Arts class weekly; three 40-

minute direct teacher consultations in Science class weekly; three 40-minute direct teacher

consultations in Math class weekly; three 40-minute direct teacher consultations in Social

Studies class weekly; and four 30-minute indirect teacher consultations monthly, all at a 12:1

ratio.  (Dist. Ex. 9, at 1.)  B.K. also was to receive four 40-minute Skills Seminar sessions per

four-day cycle at a 5:1 ratio.  (*Id.*)  B.K. also was to receive two 40-minute reading instruction

sessions per week and three 30-minute speech/language sessions per week, both at a 5:1 ratio.

(*Id.* at 2.)  Reading, writing, math, and speech/language goals were included.  (*Id.* at 7-10.)  B.K.

attended Windward during the 2009/2010 school year.  (Pls.' Ex. QQ.)

On September 3, 2009, Plaintiffs filed a Due Process Complaint Notice requesting a due

process hearing under 20 U.S.C. § 1415, asking for reimbursement for Windward tuition for the

2007/2008, 2008/2009, and 2009/2010 school years.  (Dist. Ex. 1, at 1.)[5]  Eight days of hearings

were held before a state certified Impartial Hearing Officer ("IHO"), concluding on January 29,

2010.  (IHO Ruling on Mot. to Dismiss at unnumbered page 5.)  Witnesses from both sides

testified.  (*Id.* at unnumbered pages 12-15.)  On March 19, 2010, the IHO held that Defendants

had provided B.K. with a free appropriate public education ("FAPE") for the three contested

years.  (*Id.* at unnumbered page 17.)  The IHO additionally found that Windward was not the

Least Restrictive Environment ("LRE") for B.K.  (*Id.* at unnumbered page 16.)  Thus, the IHO

denied the application for tuition reimbursement.  (*Id.* at unnumbered pages 17-18.)

Plaintiffs appealed the IHO's decision to New York State Review Officer Paul F. Kelly

("SRO").  (SRO Decision No. 10-034 ("SRO") 1.)  Defendants cross-appealed the IHO's

decision that the statute of limitations did not bar Plaintiffs' request for 2007/2008 tuition

reimbursement.  (*Id.*)  On May 27, 2010 the SRO issued a 30-page, single-spaced decision

dismissing both appeals.  (*Id.*)  In this decision, the SRO determined that Defendants had

_____

[5] Defendants moved to dismiss Plaintiffs' request for tuition reimbursement for the
2007/2008 school year as untimely.  (IHO at unnumbered pages 1-2.)  The IHO denied the
motion to dismiss, holding that the claim was brought within the two-year statute of limitations.
(*Id.* at unnumbered page 2.)

provided B.K. with a FAPE for the three disputed school years.  (*Id.* at 30.)  The SRO also held

that he did not need to reach the issue of whether Plaintiffs' unilateral placement of B.K. at

Windward was appropriate, nor the question of whether the statute of limitations barred

Plaintiffs' tuition reimbursement claim for the 2007/2008 school year.  (*Id.*)

### B.  Procedural Background

Plaintiffs initiated this lawsuit on September 23, 2010.  Plaintiffs move for summary

judgment, asking this Court to set aside the SRO's decision and grant Plaintiffs' claims for

tuition reimbursement for the three years, as well as attorneys' fees.  (Pls.' Mot. for Summ. J. 1.)

Defendants also move for summary judgment, asking this Court to affirm the SRO's decision

that they provided B.K. with a FAPE for the years in question, or alternatively the IHO's

decision that Windward "was not an appropriate placement for B.K., and/or that the two-year

statute of limitations at 20 U.S.C. § 1415(f)(3)(C) bars [Plaintiffs'] claims as concerns their

claim for tuition reimbursement for the 2007-08 school year and/or that the balancing of the

equities warrants a denial of [Plaintiffs'] claims for tuition reimbursement" for the 2007/2008

school year.  (Defs.' Mot. for Summ. J. 1-2.)  The Parties rely exclusively on the administrative

record, having submitted no additional evidence.  The Court held oral argument on July 3, 2012.

## II.  Discussion

### A. Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public

education" to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A); *see also Bd. of Educ. v.

Rowley*, 458 U.S. 176, 179 (1982) (describing the IDEA's predecessor statute as an "ambitious

federal effort to promote the education of handicapped children").  A school district within such

a state provides a FAPE when it offers "special education and related services tailored to meet

the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citation and internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 207). These services are set forth in the child's IEP, "the central mechanism by which public schools ensure that their disabled students receive a free appropriate public education." *Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir. 2002); *see also* 20 U.S.C. § 1414(d)(1)(A)-(B), (d)(3) (setting out requirements for IEPs and their development).

"The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." *M.H. v. N.Y.C. Dep't of Educ.*, — F.3d —, 2012 WL 2477649, at *24 (2d Cir . June 29, 2012).  Rather, the statute ensures an "appropriate" education, but "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).  "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).  Indeed, the IDEA does not require schools to "maximize the potential" of students with disabilities, but instead was intended "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *M.H.*, 2012 WL 2477649, at *24 (internal quotation marks omitted).

In New York, if a parent disagrees with an IEP prepared by a school district, the parent may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a).  The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and

the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A).  *See also M.H.*, 2012 WL 2477649, at *2 (generally describing the IHO and SRO process).

The Supreme Court has repeatedly held that if a state fails in its obligation to provide a disabled child a FAPE under the IDEA, the IDEA permits parents to seek reimbursement from school districts for the private placement of the child.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47 (2009); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).  The IDEA allows a district court hearing civil actions brought under the IDEA to grant "such relief as the court determines is appropriate."  *Forest Grove*, 557 U.S. at 237 (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)).  However, parents who unilaterally withdraw their child from the public schools in favor of a private placement do so at their own financial risk.  *See A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009).

In deciding whether tuition reimbursement for such a private placement is warranted, a court must first consider (1) whether "the state has complied with the procedures set forth in the IDEA," and (2) whether the IEP developed "through the [IDEA]'s procedures is reasonably calculated to enable the child to receive educational benefits."  *Cerra*, 427 F.3d at 192 (alteration and internal quotation marks omitted).  If the answer to these questions is yes, no reimbursement is permissible.  *See id.* ("If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." (internal quotation marks omitted)).  If no, the court then considers (3) whether "the private schooling obtained by the parents is appropriate to the child's needs."  *See id.* (internal quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009).  If it is, "equitable

considerations" must "support the [parents'] claim." *A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193,

205 (S.D.N.Y. 2010); *see also Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363-64 (2d Cir. 2006)

("'[E]quitable considerations [relating to the reasonableness of the action taken by the parents]

are relevant in fashioning relief.'" (second alteration in original) (quoting *Burlington*, 471 U.S. at

374)).  Because the Court may order "such relief" as it deems "appropriate," 20 U.S.C. §

1415(i)(2)(C)(iii), and because a reimbursement award is discretionary, *see* 20 U.S.C. §

1412(a)(10)(C)(ii) ("[A] court or hearing officer may require the agency to reimburse the parents

for the cost of [private] enrollment . . . ."), the Court "enjoys broad discretion in considering

equitable factors relevant to fashioning relief," *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d

105, 112 (2d Cir. 2007) (citing *Carter*, 510 U.S. at 16).  *See also, e.g.*, *E. Z.-L. ex rel. R.L. v.

N.Y.C. Dep't of Educ.*, 763 F. Supp. 2d 584, 595 (S.D.N.Y. 2011) (same); *M.H. v. N.Y.C. Dep't

of Educ.*, 712 F. Supp. 2d 125, 148 (S.D.N.Y. 2010) (same), *aff'd*, 2012 WL 2477649 (2d Cir.

June 29, 2012).

    B.  Standard of Review[6]

    Unlike with an ordinary summary judgment motion, the existence of a disputed issue of

material fact will not necessarily defeat a motion for summary judgment in the IDEA context.

---

[6] While the section of the Complaint titled "Nature of the Proceeding" states that this action is an appeal brought pursuant to New York Education Law § 4404.3 and the IDEA, (Compl. ¶ 1), the Complaint only states one cause of action: denial of a FAPE in violation of the IDEA, (*id.* ¶¶ 108-13).  The main difference between the two is that the New York Education Law has been amended so that the school district bears the burden of showing that the IEP was appropriate, N.Y. Educ. Law § 4404(1)(c), while under the IDEA the burden of proof rests with the party seeking the impartial hearing, *see Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *see also G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 573 (S.D.N.Y. 2010) (noting difference between the two laws).  The distinction is unimportant here, as the Court finds that Defendants have met any burden they may have.  The Court will therefore discuss only the IDEA hereafter.

*See, e.g.*, *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009); *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  Instead, summary judgment in IDEA cases is "in substance an appeal from an administrative determination, not a summary judgment."  *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).[7]

This posture means that this Court owes "a significant degree of deference to the state educational agency, as [it is] essentially acting in an administrative-law-style capacity."  *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008).  The Court must "give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *Gagliardo*, 489 F.3d at 113 (second alteration in original) (quoting *Rowley*, 458 U.S. at 206, 208); *see also Cerra*, 427 F.3d at 191 ("[T]he IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy.").  Therefore, this Court may not "substitute [its] own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206.  "'Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful.'"  *P. ex rel. Mr. & Mrs. P.*, 546 F.3d at 118 (alteration in original) (quoting *Walczak*, 142 F.3d at 129).  Additionally, where "the district court's decision [is] based

---

[7] Due to this different approach to summary judgment motions in IDEA cases, the Second Circuit has held that Rule 56.1 statements are not required in IDEA cases.  *See T.Y.*, 584 F.3d at 418 ("A Rule 56.1 statement, while not required, may assist the court's inquiry into whether IDEA procedures were followed and whether the result was reasonably designed to confer educational benefits.  But while a Rule 56.1 statement may assist the court in reviewing particular issues, it is not in and of itself dispositive.").  The Parties here have not submitted Rule 56.1 statements.

solely on the administrative record," deference to administrative proceedings is "particularly warranted."  *A.C. ex rel. M.C.*, 553 F.3d at 171.

However, the deference owed to the administrative decisions may be "less weighty" when it comes to reviewing whether the equities support a reimbursement award.  *W.M. v. Lakeland Cent. Sch. Dist.*, 783 F. Supp. 2d 497, 504 (S.D.N.Y. 2011) (explaining that district courts have "particular expertise" and "broad discretion" when engaging in a "balancing of the equities").  Courts reviewing administrative decisions under the IDEA must determine whether they are "reasoned and supported by the record," *Gagliardo*, 489 F.3d at 114, applying a "preponderance of the evidence" standard, 20 U.S.C. § 1415(i)(2)(C)(iii).  *See also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380-81 (2d Cir. 2003) (noting that the Supreme Court and the Second Circuit have interpreted the IDEA as "strictly limiting judicial review of state administrative decisions").

### C.  Analysis

#### 1. Procedural Compliance with IDEA

In considering whether a school district has satisfied the procedural requirements of the IDEA, courts must "'focus on whether the [parents] had an adequate opportunity to participate in the development of [the] IEP.'"  *Dzugas-Smith v. Southold Union Free Sch. Dist.*, No. 08-CV-1319, 2012 WL 1655540, at *27 (E.D.N.Y. May 9, 2012) (alterations in original) (quoting *T.P. ex rel. S.P.*, 554 F.3d at 253).  "To ensure parental participation, the Act requires, inter alia, '[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child.'"  *Cerra*, 427 F.3d at 192 (quoting 20

14

U.S.C. § 1415(b)(1)); *see also T.L. ex rel. B.L. v. Dep't of Educ.*, No. 10-CV-3125, 2012 WL

1107652, at *14 (E.D.N.Y. Mar. 30, 2012) ("Parental participation requires an opportunity to

examine records, participate in meetings, and to obtain an independent evaluation." (internal

quotation marks omitted)).

Plaintiffs do not claim any procedural violations in their motion papers nor in their

Complaint, which alleges that B.K. was denied a FAPE because of "substantive inadequacies of

the IEPs" for the relevant years. (Compl. ¶¶ 109-110.)[8]  The Court finds that Defendants have

complied with the procedural requirements of the IDEA.  Plaintiffs were given an opportunity to

examine records, participate in meetings, and obtain an independent evaluation for each of the

three IEPs in question, and have not alleged otherwise.  (Tr. 1362-66 (E.W.K. discussing April

2007 IEP meeting to formulate 2007/2008 IEP); *id.* at 1383-85 (E.W.K. discussing September

2007 meeting to formulate new 2007/2008 IEP); *id.* at 1388-91 (E.W.K. discussing May 2008

meeting to formulate 2008/2009 IEP); *id.* at 1391-96 (E.W.K. discussing August 2008 meeting

to formulate new 2008/2009 IEP); *id.* at 1398-1402 (E.W.K. discussing meeting to formulate

2009/2010 IEP); *id.* at 597 (Greco testimony that CSE meetings include input "from everyone,

from parents, from outside evaluators, from teachers, from any specialists who were there," and

noting that Plaintiffs' expert testified extensively at September 5, 2007 CSE meeting).

---

[8] Defendants characterize several of Plaintiffs' objections to the SRO's decision as procedural objections, namely the claim that the 2009-2010 IEP was deficient because it: (1) did not explain the qualifications and training of the individuals providing direct consultant teacher services; (2) did not specify the type of reading instruction; and (3) did not specify the needs and reading levels of the other students in B.K.'s proposed reading instruction group.  (Defs.' Mem. 5. (referencing SRO 28-29).)  As Plaintiffs themselves acknowledge that they are challenging the "substantive inadequacies" of the IEP (Compl. ¶ 110), the Court will address these arguments in the substantive section of its Opinion.

### 2. Substantive Adequacy of IEPs

The Court's independent review of the record reveals ample support for the administrative determination that the relevant IEPs were likely to continue the progress of B.K.'s development.  Accordingly, the Court finds that Defendants have proven by a preponderance of the evidence that the IEPs in question were reasonably calculated to provide B.K. with a FAPE.

### a. Reading Services

The heart of the dispute is Defendants' refusal to provide B.K. with the reading services requested by Plaintiffs.

### i. 2007/2008 IEP

The 2007/2008 IEP did not include reading intervention services for B.K. (Tr. 1383-84; SRO 11), nor did it include reading goals, (Dist. Ex. 1, at 3).  Defendants argue that B.K. had not demonstrated a need for reading goals or specialized reading instruction for the 2007/2008 school year.  (Dist. Ex. 2, at 2-3.)  Plaintiffs argue that the IEP was "grossly inadequate." (Compl. ¶¶ 52-54.)

Most of the recent tests before the CSE when it generated the 2007/2008 IEP in September 2007 showed that B.K. was in the average range: September 2006 Wechsler Individual Achievement Test-II ("WIAT-II") reading subtest scores (between 32nd and 37th percentile, average range) (Dist. Ex. 29, at 18; Tr. 1539-40); January 2006 New York State English Language Arts Assessment Report ("ELA") (656, classified as "Level 3: Meeting Learning Standards," and "within the target range" on the listed subcategories) (Dist. Ex. 25); October 2006 Clinical Evaluation of Language Fundamentals-4 ("CELF-4") (average range

overall, and average in all subtests except "formulated sentences," where B.K. scored "low average") (Dist. Ex. 16); October 2006 Reynolds Intellectual Assessment Scales Verbal Intelligence Index (average range) (Dist. Ex. 17); October 2006 Woodcock-Johnson-III Tests (written expression is "average to high average," and "overall reading ability is limited to average") (Dist. Ex. 10); November 2006 Qualitative Reading Inventory ("QRI-3") (instructional level on the graded word list at the fifth grade level, instructional level on reading of graded passages at the sixth grade level, and independent level on reading comprehension of passages at the sixth grade level) (Dist. Ex. 27; Dist. Ex. 44); September 2006 Scholastic Reading Inventory ("basic range for his grade level") (Dist. Ex. 27); and March 2006 Gates-MacGinitie Reading Tests 4-Level 4 (44th percentile, average range), (Dist. Ex. 28; Tr. 436-37).  An exception was the January 2007 ELA, where B.K. missed the minimum of 650 by one point, scoring a 649, and was consequently classified as "Level 2: Partially Meeting Learning Standards."  (Dist. Ex. 26.)

B.K.'s fifth grade report card, presumably prepared in late spring 2007, shows B.K. scoring either "consistent" or "exemplary" in all fields, except for an "inconsistent (sometimes meets requirements)" in the third quarter under the category of "writing is clear, organized and fully developed," as well as an "inconsistent" in the first quarter for both Social Studies and Math.  (Dist. Ex. 20.)  In B.K.'s October 2006 and April 2007 student evaluations, Rochelle Frei Mitlak,[9] B.K.'s fifth grade literary extension teacher, wrote that B.K. was "performing in an acceptable range," "making good progress," and "has good abilities to complete assignments."

_____

[9] Ms. Mitlak seems to have changed her name between the time she taught B.K. and the time she was deposed: her name on several evaluations is "Rochelle Frei," and her name during the deposition was stated as "Rochelle Frei Mitlak."  The Court will refer to her as Ms. Mitlak.

(Dist. Exs. 18, 19.)  Ms. Mitlak testified that B.K.'s reading skills were on grade level (Tr. 437), and that he was able to manage the fifth grade curriculum, (*id.* at 436, 439, 452).

Further, the evidence before the CSE in September 2007 showed that B.K. was progressing under the prior IEPs, which did not include separate reading instruction.  In September 2003, B.K. took the Gates-MacGinitie Reading Test and scored in the 21st percentile total, in September 2004, he scored in the 11th percentile total, in April 2005, the 25th percentile total, and in March 2006, the 44th percentile total.  (Dist. Ex. 28; Pls.' Ex. J, at 3.)  Between 2003 and 2006, the two times that Dr. Flaum administered the Wechsler Intelligence Scale for Children, B.K.'s verbal comprehension increased from 58th percentile to 66th percentile, his processing speed index from 9th percentile to 21st percentile, and his full scale score from 39th percentile to 55th percentile.  (Dist. Exs. 29, 30.)  On the WIAT-II test, word reading increased from 27th percentile to 32nd percentile, reading comprehension from 9th percentile to 34th percentile, and written expression from 12th percentile to 27th percentile.  (*Id.*)  On B.K.'s fifth grade report card, his teachers stated that B.K. had "shown excellent growth," had "shown growth and improvement," "continue[d] to make steady progress," and had "accomplished great things."  (Dist. Ex. 20.)

Tricia Greco, B.K.'s fifth grade special education case manager (i.e. the "Consultant Teacher Direct" listed on the 2006/2007 IEP), who consulted with B.K.'s teachers daily, testified that B.K. was doing fifth grade curriculum work and "had no difficulty in reading fifth grade materials," and that based on his test results and teacher input, she believed B.K. did not require reading related services.  (Tr. 558-59.)  Ms. Mitlak testified that based on her work with B.K.

and the testing she conducted, she believed he "was receiving the reading support that he needed" through her work with him in literary extension, and that the consensus among B.K.'s teachers was that "he was performing appropriately and could receive the support he needed within the context of the classroom." (*Id.* at 439.) Indeed, there was testimony that B.K. was already receiving reading help in his regular education classes, including Social Studies, Writing, and Language Arts. (*Id.* at 296 (statement that in 2006 B.K. was receiving "extra help in reading," and "special education support geared toward" his IEP reading goals); *Id.* at 552-53 (Greco's testimony that she delivered services, including reading services, in regular classes).) Dr. Jerry Wishner, Defendants' Director of Special Education, testified that the skills seminar class provided for in the 2007/2008 IEP would have been similar to these services provided to B.K. during his fifth grade year, discussed above. (*Id.* at 76-78.) Mary Ford, co-chairperson of the District's Reading Department, testified that while she believed reading goals would have been appropriate, separate reading services were not necessary because reading goals would be addressed within the services already provided by the IEP. (*Id.* at 806-08.) Dr. Wishner testified that the 2007/2008 IEP was appropriate, and that he did not believe that B.K. required special reading instruction. (*Id.* at 79-81.)

The administrative record before the IHO persuasively demonstrates that B.K.'s reading improved through his early elementary school years, and was by almost all measurements — including the assessments of his teachers — at grade level by the fifth grade. This is fatal to Plaintiffs' claim, as the Second Circuit has "expressly held that when a learning-disabled child is in a mainstream class, 'the attainment of passing grades and regular advancement from grade to grade' will generally constitute evidence of satisfactory progress." *Cerra*, 427 F.3d at 196

(quoting *Walczak*, 142 F.3d at 130); *see also Z.D. v. Niskayuna Cent. Sch. Dist.*, No. 06-CV-1190, 2009 WL 1748794, at *4 (N.D.N.Y. June 19, 2009) ("Review of grades and advancement from grade to grade are accepted indicators of satisfactory progress."); *Petricelli v. Carmel Cent. Sch. Dist.*, No. 06-CV-2114, 2007 WL 465211, at *16 (S.D.N.Y. Feb. 9, 2007) (agreeing with SRO's conclusion that IEP provided a FAPE where student advanced from grade to grade). Further, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195.

The Court finds that given the objective evidence of B.K.'s success and progress under similar IEPs with no reading instruction, the 2007/2008 IEP was reasonably calculated to enable B.K. to receive educational benefits, and provided B.K. with a FAPE, even if it did not include particular reading programs or goals provided in prior years. *See Student X v. N.Y.C. Dep't of Educ.*, No. 07-CV-2316, 2008 WL 4890440, at *16 (E.D.N.Y. Oct. 30, 2008) (upholding SRO's determination that IEP provided a FAPE, even though it did not provide for at-home services provided for in prior year's IEP, noting that "services found to be appropriate for a student during one school year are not necessarily appropriate for the student during a subsequent school year"); *B.L. v. New Britain Bd. of Educ.*, 394 F. Supp. 2d 522, 534-35 (D. Conn. 2005) (finding that IEP provided a FAPE even though it did not provide for "consultative services" provided for in earlier IEPs, because testimony and testing demonstrated that the student had made "great gains" and was viewed as no longer in need of such services). While it is understandable that Plaintiffs may have wanted more for their child, the law did not require the District to do more than it did for B.K. As then-Judge Ginsburg has observed, because public resources are not infinite, federal law "does not secure the *best* education money can buy; it calls upon

government, more modestly, to provide an *appropriate* education." *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (emphasis in the original).

<u>ii. 2008/2009 and 2009/2010 IEPs</u>

The 2008/2009 IEP added four annual reading goals, as well as two 40-minute sessions of reading instruction services per week at a 5:1 ratio. (Dist Ex. 8, at 1, 8.) Defendants state that this change was made after review of Windward reports, discussion with B.K.'s 2007/2008 Windward teacher and E.W.K., and in response to the decrease in B.K.'s Stanford 10 reading comprehension score from the 26th percentile in September 2007 to the 18th percentile in May 2008 (after one year at Windward). (Tr. 285-86, 311-15, 322-23; Dist. Ex. 33 (Stanford 10 reading scores).) At the CSE meeting, Plaintiffs requested five days per week of reading instruction, but did not object to the remainder of the 2008/2009 IEP. (Dist. Ex. 8, at 7; SRO 26.) The 2009/2010 IEP included five reading goals, and recommended the same two sessions per week of reading instruction services. (Dist. Ex. 9, at 2, 7-8.) In making this recommendation, the CSE considered Windward reports, B.K.'s previous evaluations, new evaluations, and testimony from E.W.K. and B.K.'s Windward teacher. (Dist. Ex. 9, at 7.) E.W.K. again requested that B.K. receive more reading intervention services. (Tr. 1399; SRO 13.)

Plaintiffs argue that the 2008/2009 and 2009/2010 IEPs, which provided for reading instruction twice per week for 40 minutes "in a group of five students of unspecified ability, by an unspecified teacher, via an unspecified approach," did not provide "the intensity, frequency, or need-based educational approach required by B.K." (Compl. ¶¶ 64-65.) Plaintiffs argue that B.K. needed "daily individual reading instruction for at least one hour per day, with a teacher

trained in a research-based, multi-sensory approach such as Orton Gillingham" (*id.* ¶ 65), as recommended by Plaintiffs' witnesses, (*id.* ¶¶ 66-67).

As to the frequency of the instruction, Elizabeth Wright, the August 2008 CSE chairperson, testified that the CSE had "extensive conversation" about the reading recommendation, and as a committee thought that daily reading instruction would be too much, because it would take too much time away from B.K.'s general education classes. (Tr. 287.) Ms. Wright stated that she felt that two 40-minute sessions represented B.K.'s LRE, and that it was "important for him to be able to benefit from having his typical peers be educated alongside him and in the classroom with him." (*Id.* at 290.) Ms. Wright testified that reading instruction would take place not only in the reading service sessions, but also "throughout the day" in B.K.'s other classes. (*Id.* at 287-88.) Ms. Mitlak, B.K.'s fifth grade literary extension teacher and a reading specialist, testified that she believed that B.K. would have been able to meet both his 2008/2009 and 2009/2010 reading goals with two sessions of reading related services per week. (*Id.* at 453-54.) Dr. Wishner also testified that he believed that two reading sessions per week would have been sufficient. (*Id.* at 98.)

As to the allegations of a lack of specificity in the IEPs, Ms. Wright stated that the District "would be delivering a reading program based on the standards and based on research-based approaches to reading," and that the committee "didn't discuss specific instructional approaches because we would be basing that on children's individual needs." (*Id.* at 288-89.) Ms. Ford testified that in these reading groups, "students with similar needs [were] grouped together," as determined by their test scores on reading inventories. (*Id.* at 810.) Dr. Wishner stated that the District did not usually include teacher qualifications in the IEP, because when services are listed, "it's understood that we only have highly qualified certified teachers . .

. I have really never heard a concern described that we have uncredentialed and uncertified teachers in place.  We don't." (*Id.* at 104.)  Dr. Wishner further stated that the District did not usually specify the level of the other students in the group with the child, but that upon request, the District would provide parents with "a profile of a functional group that a student might be in" (*id.* at 104-05), and that students of similar needs were placed together for these groups, (*id.* at 182-83).  As noted by the SRO, New York State regulations do not require that an IEP include information on the qualifications and training of individuals providing direct consultant teacher services, or the needs and reading levels of the other students in the proposed reading instruction group.  (SRO 28-29; N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2).)

As noted above, "deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195.  Although the Court must independently review the administrative record, such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206; *see also Gagliardo*, 489 F.3d at 112-13 (same).  Furthermore, the Court (as did the SRO) must take into consideration the IDEA's goal to mainstream children with disabilities to the maximum extent possible.  *See* 20 U.S.C. § 1412(a)(5)(A) (stating that to "the maximum extent appropriate, children with disabilities" should be removed "from the regular educational environment . . . only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily"); *see also M.H.*, 2012 WL 2477649, at *2 ("[T]he CSE must also be mindful of the IDEA's strong preference for mainstreaming, or educating children with disabilities [t]o the maximum extent appropriate alongside their non-disabled peers." (alterations in original) (internal quotation marks omitted)).

Here, the District took into consideration all available data when formulating the
2008/2009 and 2009/2010 IEPs, including B.K.'s test scores, Windward reports, Dr. Flaum's
reports, teacher reports, and E.W.K.'s testimony, and determined both that two days a week of
reading instruction would be sufficient to meet B.K.'s annual goals, and that five days a week of
reading instruction would take B.K. out of his mainstream classes too frequently, and "would be
a detriment to his learning, rather than an asset." (Dist. Ex. 8, at 4-7; *see also* Dist. Ex. 9, at 4-
7.) Based on a review of the record, the Court concludes that a preponderance of the evidence
supports the SRO's determination that the 2008/2009 and 2009/2010 IEPs were reasonably
calculated to enable B.K. to receive educational benefits, and that Defendants provided B.K.
with a FAPE. *See, e.g.*, *M.C. v. Katonah/Lewisboro Union Free Sch. Dist.*, No. 10-CV-6268,
2012 WL 834350, at *10-11 (S.D.N.Y. Mar. 5, 2012) (affirming SRO's decision that IEPs for
dyslexic child were appropriate, over parents' objections that reading goals were inadequate and
specialized reading instruction was insufficient because it did not mandate that instruction be
provided by a reading specialist, where "district offered extensive testimony from district staff
that the disputed IEPs, including the recommended reading goals, were appropriate and
reasonably calculated to produce educational progress"); *D.G. v. Cooperstown Cent. Sch. Dist.*,
746 F. Supp. 2d 435, 446-48 (N.D.N.Y. 2010) (affirming SRO's decision that IEP for dyslexic
student was adequate, despite parents' objections that district did not use Orton-Gillingham
based program, and that 5:1 resource room setting for reading instruction was inappropriate);
*Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 427-28 (S.D.N.Y. 2007) (affirming
SRO's decision that IEP for dyslexic student was adequate, where IEP offered "specially
designed reading instruction in a small group setting, using the Wilson Methodology"), *aff'd*,
293 F. App'x 20 (2d Cir. 2008); *Watson ex rel. Watson v. Kingston City Sch. Dist.*, 325 F. Supp.

2d 141, 142-43, 145 (N.D.N.Y. 2004) (holding that an IEP that provided student with auditory language processing disability with one-on-one speech therapy for forty minutes and multi-sensory reading instruction for thirty minutes every six school days was adequate), *aff'd*, 142 F. App'x 9 (2d Cir. 2005).

b. Private Tutoring

Plaintiffs argue that the SRO found that B.K. made progress as a student in the District without taking into account the private tutoring he was receiving.  (Pls.' Mem. 18-19.)  The majority of the evidence of the private tutoring comes from E.W.K.'s testimony.  E.W.K. testified that:

- during first grade, B.K. received one hour per week of tutoring on "trying to learn how to read and stay on top of his school work" (Tr. 1270);

- during second grade, B.K. received two hours per week of private tutoring: one hour with a reading teacher and one hour with a general education teacher (*id.* at 1278-79);

- during third grade, B.K. had the same basic tutoring schedule, but some weeks if the reading instructor was available B.K. would receive an additional hour of reading instruction (*id.* at 1289);

- at some point during third grade, B.K. broke his leg and missed three and a half weeks of school, during which he received four hours of private tutoring per week, in addition to a tutor that Defendants sent to the house to work with B.K. (*id.* at 1295);

- during fourth grade, B.K. received three to four hours of private tutoring per week (*id.* at 1307); and

- during fifth grade, B.K. received four hours of private tutoring per week, from both reading and general tutors (*id.* at 1338), which consisted of tutors "basically go[ing] over

the material with [B.K.] at night after school" to "make sure he understood what was

going on," (*id.* at 1339).

E.W.K. testified that it was difficult to find time for B.K. to play sports or have play dates, due to

his tutoring schedule.  (*Id.* at 1352.)  E.W.K. states that during fifth grade, Plaintiffs were

spending approximately $25,000 per year on tutoring fees.  (*Id.* at 1361.)  E.W.K. did not

explicitly state during her testimony that she believed that the tutors had a positive effect on

B.K.'s performance.  She instead commented that "[w]ith all the tutors [B.K.] kept treading

water, he was struggling" in fifth grade (*id.* at 1376), and that B.K. "desperately needed the

tutors working with him" in fifth grade, (*id.* at 1339).

While the Court is sympathetic to Plaintiffs' position, as the SRO noted, "the hearing

record does not include information about the nature of the tutoring services provided, nor does

it show how much of [B.K.]'s progress could be attributed solely to the private tutoring."  (SRO

20 n.13.)  Plaintiffs did not call the tutor to testify at the hearings (Defs.' Opp'n 7), and E.W.K.

did not maintain any records of the tutoring, (Tr. 1414).  There is no information as to what

percentage of the tutoring was reading-related after third grade.  Certainly, B.K. showed

improvement on tests such as the Gates-MacGinitie reading test, taken yearly from 2003-2007.

(Pls.' Ex. J, at 2-3; Dist. Ex. 28; Dist. Ex. 8, at 4-5.)  But as the tutoring ramped up, so did the

amount of help that B.K. was receiving at school pursuant to his IEPs, and it is difficult to

disaggregate the potential effect of each.  (Pls.' Ex. J; Pls.' Ex. X; Pls.' Ex. K; Dist. Ex. 4.)

Without more detailed information to allow the Court to evaluate the extent to which B.K.'s

tutoring affected his academic progress, the Court does not find that Defendants failed to provide

B.K. with a FAPE for the relevant school years.[10]  *Cf. Adams v. State of Oregon*, 195 F.3d 1141,

1149-50 (9th Cir. 1999) (holding that determination of whether an IFSP (the IEP equivalent for

infants and toddlers) was adequate did not require evaluation of the impact of private tutoring

provided by parents, but turned on whether the IFSP was "designed and implemented" to

provide the child with a meaningful benefit).  Here, because the Court concludes that there is

ample evidence supporting the SRO's determination that the District's IEPs provided B.K. with

a FAPE, based on the terms of those IEPs, the Court need not speculate about the impact of the

private tutoring.

<u>c. Evaluation of Witnesses</u>

Plaintiffs argue that the SRO gave undue credit to Defendants' witnesses, while

dismissing or ignoring testimony from Plaintiffs' witnesses, namely E.W.K., Roberta Plotycia

---

[10] Plaintiffs cite "Letter to Lillie/Felton" as support for their argument.  (Pls.' Mem. 19.)
This is a response by North Carolina's Department of Public Instruction ("NCDPI") to a request
by the Learning Disabilities Association of North Carolina ("LDANC") for clarification on
policies promulgated by North Carolina's Office of Special Education and Rehabilitative
Services.  Office of Special Educ. Programs, *Letter to Lillie/Felton*, 23 IDELR 714, at 1 (1995),
*available at* http://www.flspedlaw.com/lilliefenton.pdf.  LDANC was concerned that students
with learning disabilities who sought special education services were not qualifying for these
services, because they were testing at grade level due to exceptional levels of help from parents,
teachers, and private tutors.  *Id.* at 3.  NCDPI responded that it would be generally appropriate
for an evaluation team, when determining whether a student was eligible for special education
services, "to consider information about outside or extra learning support provided to the child
. . . as such information may indicate that the child's current educational achievement reflects the
service augmentation, not what the child's achievement would be without such help."  While the
Court is willing to accept the general proposition that one should consider information about
extra learning support provided to the child at various stages of the IDEA process, as noted
above, without more specific information as to the nature and effect of the tutoring, the Court
does not find that the IEPs were inappropriate.  It is also worth noting that the parents have never
sought reimbursement for the tutoring B.K. received.  *See Michael P. v. Dep't of Educ.*, 656 F.3d
1057, 1069 (9th Cir. 2011) (noting that reimbursement for private tutoring is available under the
IDEA); *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 56 F. Supp. 2d 243, 262-63 (D. Conn.
1999) (granting plaintiffs reimbursement for tutoring provided at private school), *reversed on
other grounds*, 226 F.3d 60 (2d Cir. 2000).

(B.K.'s teacher at Windward), Dr. Flaum, and Dr. Marianne Gorlyn, a psychologist.  (Pls.' Mem. 15-18.)  The SRO in fact discussed Dr. Flaum's evaluations of B.K. at some length (SRO 2-3 (2003 report), 4-5 (2006 report)), and discussed in detail why he had chosen not to rely on certain of her assertions, (*id.* at 20 n.14, 21 n.15, 25-26, 28).  The SRO also discussed E.W.K.'s testimony throughout his opinion.  (*Id.* at 2, 3-4, 6, 9, 10-12, 26.)  The IHO discussed Ms. Plotycia and Dr. Gorlyn's testimony, as well as his reasons for giving less weight to Ms. Plotycia's testimony.[11]  (IHO at unnumbered pages 14-15.)

The type of second-guessing and re-weighing of competing expert testimony urged by Plaintiffs is precisely the type of review discouraged by *Rowley*, where the Supreme Court overturned a district court's reversal of an administrative decision, holding that the reviewing court had impermissibly "impos[ed its] view of preferable educational methods upon the States" by accepting the testimony of experts that had been found insufficient by the SRO on a "long debated" question of educational methodology.  *Rowley*, 458 U.S. at 207 & n.29.  Following this same approach, the Second Circuit, in *Grim v. Rhinebeck Central School District*, reversed a district court which held that "[n]either the IHO nor the SRO [reviewing the two later IEPs] gave appropriate consideration to the experts on dyslexia, who had personal knowledge of the student in question."  346 F.3d at 383 (alterations in original) (citing district court opinion).  In reversing, the Second Circuit held that "in violation of *Rowley*, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy — effective methods of educating dyslexic students — in direct contradiction of the opinions of

---

[11] The IHO noted that Ms. Plotycia is a certified guidance counselor and is not a certified reading teacher or certified in special education, that she knew nothing about the program at the District's schools, and that she was not familiar with the term double dyslexia or any research in the area.  (IHO at unnumbered pages 14-15.)

state administrative officers who had heard the same evidence." *Id.* The Second Circuit commented that "the District Court misapplied the standard of review applicable in IDEA cases by not according 'due weight' to administrative determinations under the IDEA when it concluded that the [challenged] IEPs were substantively inadequate under the IDEA." *Id.*

This Court therefore defers to the IHO and SRO's evaluation of the competing testimony of the Parties' expert witnesses. *See J.R. v. Bd. of Educ.*, 345 F. Supp. 2d 386, 399 (S.D.N.Y. 2004) ("Moreover, our review of the record revealed numerous factual disputes with respect to [the student]'s demeanor and academic progress, including reasons for her declining test scores, the resolution of which necessarily required the IHO to make a credibility judgment. Thus, on this second level of review of the IHO's decision, we accord the deference, traditional on appellate review, to his assessment of the credibility of those witnesses who testified before him."); *Watson*, 325 F. Supp. 2d at 145 ("The mere fact that a separately hired expert has recommended different programming does nothing to change [the decision that the IEP was appropriate], as deference is paid to the District, not a third party. So long as the administrative record provides sufficient support that the substantive contours of the IEP are reasonably calculated to confer educational benefits, as it does here, it is not within a Court's purview to upset the programming recommended by the CSE." (citations omitted)).[12]

---

[12] While the Court performed its own independent review of the record, it notes that deference to the SRO's decision is particularly appropriate here, where the SRO wrote a thorough and careful single-spaced 30-page opinion which cited extensively to the administrative record, and this Court has based its determination solely on the administrative record. *See, e.g.*, *P. ex rel. Mr. & Mrs. P.*, 546 F.3d at 117, 123 (upholding SRO's determination, where SRO, "[a]fter exhaustively reviewing the record," wrote a thirty-five page opinion); *T.L. ex rel. B.L.*, 2012 WL 1107652, at *13 (noting that SRO decision warrants deference, where SRO "issued a 21-page, single spaced, well-reasoned analysis . . . comprised of detailed findings well supported by frequent citations to the record," and district court based decision entirely on the administrative record).

### 3. Windward as B.K.'s LRE

Plaintiffs argue that the SRO misunderstood "the purpose and application of the least restrictive environment standard," which determines "the extent to which children with disabilities can be segregated by school districts from their typically developing peers," and is not a requirement "to be strictly applied to parents who have placed a child in a private school." (Pls.' Mem. 19.)  Plaintiffs argue that Windward is the LRE for B.K. because it has enabled him to progress as a reader and has freed him "from the hours of private tutoring necessitated by his inappropriate placement in the District."  (*Id.* at 20.)

In fact, the SRO declined to reach the issue of whether Plaintiffs' unilateral placement of B.K. at Windward was appropriate, as he found that Defendants offered B.K. a FAPE for the relevant school years.  (SRO 30.)  Because this Court concludes that the SRO's conclusion is amply supported by the record, it similarly finds that its inquiry is at an end.  *Cerra*, 427 F.3d at 192 ("'If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.'" (quoting *Rowley*, 458 U.S. at 207)); *see also T.Y.*, 584 F.3d at 417 (same).

30

### III. Conclusion

For the reasons given above, Defendants' Motion for Summary Judgment is granted and

Plaintiffs' Motion for Summary Judgment is denied. The Clerk of the Court is respectfully

request to terminate the pending motions (Dkt. Nos. 19, 23), enter judgment for Defendants, and

close the case.


SO ORDERED.

DATED:      White Plains, New York
               July **3**⌐ , 2012

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

31

Service List (via ECF)

Julie Ero Gaughran, Esq.
Asher & Associates
111 John Street, Suite 1200
New York, NY 10038
(914) 273-3187
Fax: (914) 273-3206
Email: gaughran@ashergaughran.com
Counsel for Plaintiffs

Mark Craig Rushfield, Esq.
Lisa S. Rusk, Esq.
Shaw, Perelson, May & Lambert, LLP
21 Van Wagner Road
Poukeepsie, NY 12603
(845) 486-4200
Fax: (845) 486-4298
Email: mrushfield@shawperelson.com
        lrusk@shawperelson.com
Counsel for Defendants